ROSE v. FIRST NAT. BANK OF STIGLER.

No 10755—Opinion Filed July 24, 1923.

Rehearing Denied Oct. 30, 1923.

1. **Corporations—Good Faith of President —Exercise of Powers for Private Gain.**

The president of a corporation is bound to exercise his official powers for the benefit of the corporation in the utmost good faith, and in no case can he be permitted to use his official powers to his own private gain and advantage, to the detriment of the corporation.

2. **Same—Trusts — Continuance of Good Faith to End of Transaction.**

Where a transaction has its inception in a fiduciary relationship, the mere fact that the relation is temporarily suspended does not relieve the person acting in such fiduciary relation in the beginning of the transaction from exercising the utmost good faith toward the corporation in the final settlement growing out of the transaction so commenced by virtue of the trust relation.

3. **Trusts—Constructive Trusts — Concealment of Facts by One in Fiduciary Relation.**

If a person standing in a special relation of trust and confidence to another has information concerning property, and contracts with the other and does not disclose his exclusive knowledge, the contract may be voided, or he may be held as a constructive trustee.

4. **Same—Instructions.**

Instructions given and refused examined; held, that the court did not err in the instructions given, nor in refusing instructions offered.

5. **Frauds, Statute of—Contract Performed Except Payment of Money.**

The provisions of the statute of frauds, or uses and trusts, have no application where the agreement has been completely performed as to the part thereof which comes within the statute, and the part remaining to be performed is merely a payment of the money, the promise to do which is not required to be in writing.

6. **Trusts—Breach of Trust — Action—Accounting—Petition.**

Where a petition shows upon its face that the action is based upon a breach of trust, and asks for an accounting, such action is an equitable one, and the fact that a recovery of money is sought in such action does not change the character of the action.

7. **Same—Judgment — Sufficiency of Evidence.**

Record examined, and held, that the evidence is sufficient to support the judgment.

(Syllabus by Pinkham, C.)

Commissioners' Opinion, Division No. 5.

Error from District Court, Haskell County; E. F. Lester, Judge.

Action by the First National Bank of Stigler against Sam Rose. Plaintiff recovered judgment, and defendant appeals. Affirmed.

Geo. S. Ramsey, Edgar A. deMeules, Malcolm E. Rosser, and Villard Martin, for plaintiff in error.

Guy A. Curry, for defendant in error.

Opinion by PINKHAM, C. This suit was brought by the First National Bank of Stigler against Sam Rose. The defendant below is the plaintiff in error here, and the parties will be referred to as they appeared in the court below.

The plaintiff recovered a judgment, and this appeal is from the judgment so rendered.

The plaintiff's petition alleges, in substance:

"That on the 30th day of September, 1911, one Henry Cooper, being at that time indebted to the plaintiff in a large sum of money, to wit: $1,500, executed and delivered to plaintiff his certain real estate mortgage covering the following described lands, being within Carter county, Oklahoma, to wit: (describing said lands), and being a second lien thereon; one Jane P. Williams holding a first mortgage lien against said lands for a principal sum of $2,250.

"That at the time of the execution and delivery of said mortgage to the said Jane P. Williams, and at all times hereinafter mentioned, the said defendant Sam Rose was the duly authorized and acting agent of the said Jane P. Williams, and was at all times up until the 13th day of January, 1913, the president of the plaintiff bank.

"That during the period from the 13th day of January, 1913, to the 20th day of May, 1914, one Charles C. Sloan was the president and official head of the plaintiff bank, after which said defendant again became president of the plaintiff bank, and was its active and official head until the ——day of ——— 1916.

"That both of said mortgages became subject to foreclosure—and it became necessary to institute suits in the district court of Carter county, Oklahoma, toward the foreclosure of said mortgages; and according to agreement and understanding, orally made between the plaintiff bank by its president, Charles C. Sloan, and the defendant, as the acting agent of Jane P. Williams, two foreclosure suits were simultaneously brought in the district court of Carter county, Oklahoma, upon the mortgages above mentioned, covering the lands above mentioned, the plaintiff in each suit being represented by the bank's attorneys—which (suits) were later consolidated and proceeded with jointly, and thereafter judgment and decree of foreclosure entered therein on the 27th day of May, 1913, in favor of said Jane P. Williams, against the said Cooper in the sum of $2,504.22, with interest thereon, together with an attorney's fee of $238.50, and a further judgment in favor of the said First National Bank of Stigler, against the said Cooper in the sum of $1,600, with interest thereon, and attorney's fees, and providing in said judgment and decree that the said Jane P. Williams had a first and prior lien on said lands to the amount of said indebtedness due her from said Cooper, and the said First National Bank of Stigler a second lien thereon to the amount of the indebtedness due it from said Cooper, and a further judgment and decree of sale of said real estate to satisfy all of said indebtedness.

"That on the 1st day of December, 1913, an order of sale issued in said cause for the sale of said real estate and pursuant to notices issued thereon by the sheriff of Carter county, Oklahoma, said land was sold and conveyed by sheriff's deed to the defendant, Sam Rose, on to wit, the — - day of January, 1914, for a consideration of $3,200.

"That at the time of the institution of said action in the district court of Carter county, Oklahoma, it was orally agreed by and between the defendant and the plaintiff bank by its then president, Charles C. Sloan, that in all matters, actions and pro-ceedings taken with reference to said lands by said parties plaintiff that they would proceed jointly, acting together so that their several interests might be the better protected and conserved and in these transactions and at all times herein mentioned, said defendant, Sam Rose, was acting either as plaintiff's agent and official representative or its agent and trustees.

"That about the time of the sale of said lands under foreclosure and a short time prior thereto, it was orally agreed by and between the plaintiff bank, by its president, Charles C. Sloan, and the defendant that at the time of said sale said defendant should go to Ardmore at time and place of sale of said lands, and there act for the plaintiff bank and the said Jane P. Williams, and should bid on said lands at the sale thereof to the full amount of the total indebtedness against the same in favor of the plaintiff bank, and the said Jane P. Williams, so as to fully protect both, and realize therefrom the total indebtedness due both parties, but in the event that said lands should be purchased by said defendant for a sum less than the total indebtedness due both the plaintiff bank and the said Jane P. Williams, that the several interests of the plaintiff bank and said Jane P. Williams should be pooled and the lands bought in the name of the said Sam Rose, and he to hold the same in trust for both the said Jane P. Williams and the plaintiff bank, and the said lands thereafter to be sold by the said Sam Rose and the proceeds of said sale divided so that the said Jane P. Williams should receive 33-51, and the plaintiff bank 18-51 of the proceeds of the sale of said lands.

"That pursuant to said agreement, orally made, between the said Sam Rose and the plaintiff with reference to the purchase of said lands at foreclosure and the future sale of the same, and the divisions of the proceeds thereof, as aforesaid, said Sam Rose, so acting in the capacities aforesaid, went to Ardmore at the time and place of said sale of said lands and did purchase the same at said foreclosure sale for a consideration of $3,200, not actually paid by said Sam Rose therefor, but credit taken by him against the indebtedness in favor of the said plaintiff bank and said Jane P. Williams from said Cooper.

"That thereafter and on the —— day of ——————, 1917, said defendant, Sam Rose, did sell said lands for a total consideration of $5,200, and that according to said agreement there became due and payable to the plaintiff from said defendant, on the —— day of ——————, 1917, the sum of $1,818, which amount said defendant failed and refuses to deliver or pay to the plaintiff, and wholly fails and refuses to account for any of said moneys so received by him belonging to the plaintiff.

"That it was not until the —— day of ——————, 1918, that the plaintiff be-

came aware of the sale of said property and of the failure and refusal of the defendant to account for and pay over to the plaintiff its proportionate share of the proceeds of said sale."

This was followed by prayer for judgment. The defendant demurred to this petition. The demurrer was overruled and the defendant excepted.

The amended answer of the defendant admitted that Henry Cooper was indebted to the plaintiff on the 30th day of September, 1911, and admitted that Jane P. Williams held the first mortgage lien against the land described in the petition as alleged therein, and admitted that he, the defendant, was the agent of Jane P. Williams for the purpose of assisting her in collecting the debt, but alleged he had no authority to represent her except for that purpose. The answer further admitted that both mortgages became subject to foreclosure and admitted that separate suits were brought to foreclose them and that a decree of foreclosure was entered as alleged in the petition, and that an order of sale was issued in the case, and admitted that the lands were sold to him for the consideration of $3,200. The answer further denied all the allegations in the petition not specifically admitted, and then pleaded the statute of limitations and the statute of frauds.

The case was tried before a jury, without exception by either party, and resulted in a verdict for the plaintiff for $1,927, with interest, and costs. Judgment was rendered by the court in accordance with the verdict. Motion for new trial was filed, presented, and overruled, to which defendant excepted, and gave notice of appeal.

The defendant assigns a number of errors. The second assignment is that, "The court erred in refusing to instruct the jury to find the issues in favor of the plaintiff in error as requested by said plaintiff in error, in the following instruction:

" 'You are instructed to return a verdict for the defendant'."

It is the contention of the defendant that the evidence for the plaintiff was not sufficient to take the case to the jury. It is pointed out in the argument that evidence to sustain a claim such as is made by the plaintiff in this case, must be clear and convincing; that a mere preponderance of the evidence is not sufficient and we are earnestly requested to examine the evidence in the case.

The rule is undoubtedly well settled that the evidence to enforce a parol trust must be clear and convincing, and this court has adopted such rule. Hayden v. Dannenberg, 42 Okla. 776, 143 Pac. 859. The rule is also well established by the authorities that where a prima facie case of constructive fraud is made out from the fiduciary relationship of the parties, and other circumstances connected with the transaction, the burden of proving good faith is upon the party denying the existence of the trust. 39 Cyc. 191.

The court, in instruction No. 1, told the jury that the ultimate facts must be found by evidence "clear, definite, and convincing."

The evidence disclosed in the record of this case is that the defendant was the official head, the president, of the plaintiff bank from 1904 up to and until sometime in 1918, with the exception of about 16 months from January, 1913, to May 20, 1914; that during this period of 16 months he occupied an office, free to him, in the directors' room of the bank, and was consulted by his successor, Charles C. Sloan, as president of the bank, concerning the bank's affairs, and that he was the bank's advisor; that his successor consulted him frequently, and placed implicit confidence in the defendant's advice in matters affecting the bank's interests; that about the 20th day of May, 1914, Mr. Sloan, as president of the bank, retired, and the defendant again became the president and managing head of the bank, and remained such until sometime in 1918; that while the defendant was managing head of the bank he made both of the aforementioned loans, the first as agent of Jane P. Williams, and the second as president of the bank; that after the defendant had retired the first time as president of the bank, but maintaining an office in the directors' room, the attorneys for the bank brought the foreclosure suits on the two mortgages in separate suits, the suits being subsequently consolidated, and a joint judgment rendered. The record shows that the banks paid one-half of the attorney's fees in both cases. Of the entire expenses, including one-half of the attorney's fees, sheriff's costs, etc., the bank paid $217.33, and the defendant $279.20.

The defendant went to Ardmore at the time of the sheriff's sale to look after his own interests in the Williams' judgment, and as a representative of the plaintiff bank, accompanied by the bank's attorneys.

The defendant bought the land at the sale and took credit for part of purchase money on the plaintiff bank's judgment.

There is evidence that at that time the defendant and C. W. Sloan, then president of the bank, considered that the land was ample security for both indebtednesses.

The president, C. W. Sloan, testified in substance that he, on behalf of the bank, and the defendant, as the agent of Jane P. Williams, owner of the first mortgage, entered into an oral agreement to the effect that the defendant should go to Ardmore on the day of the sheriff's sale and protect the interests of the bank and Jane P. Williams; that, if no person bid enough to cover both mortgages, the defendant would bid in the land, and take title to the same, and then sell the same and divide the proceeds between the bank and Jane P. Williams at the ratio of 18-51 to the bank, and 33-51 to Jane P. Williams.

Referring to the time of the sheriff's sale of the lands, the witness Sloan testified:

"I had to leave that matter with Mr. Rose (defendant) to look after it to protect both his friends and the bank. Mr. Rose had been president of the bank at the time the mortgage was taken, and had the matter in charge and I thought it was in good hands, and left it to him to protect both of us."

That on December 26, 1913, the defendant took an assignment of the Williams judgment, and a few days thereafter, January 6, 1914, the defendant went to Ardmore on the day of the sale, and bought the lands for the consideration of $3,200, he being the best and highest bidder, and that the defendant procured a deed to said lands. On the 20th day of May, 1914, Sloan retired from the presidency of the bank, and the defendant was again chosen president and managing head of the plaintiff bank. On May——, 1917, the defendant sold the land in question for $5,200, and deposited the said sum to his personal account in the plaintiff bank, and that the bank received nothing on its judgment.

The bank's judgment amounted, with interest, to $2,256.62. The Williams judgment was $2,504.22, with an attorney's fee of $238.50.

The only material dispute of these facts is concerning the agreement as to the division of the proceeds of the sale of the lands between the defendant and the plaintiff bank.

The defendant testified, in substance, that a day or two before he started for Ardmore, he told Mr. Sloan, the president of the bank, that he, the defendant, was the holder of the Williams judgment; that he had purchased it from Miss Williams and that he would go and bid on the land, and protect the bank against other bidders and use his judgment in the purchase of the land, after which, if the bank wanted the land, "all they needed to do was to pay the first judgment—to pay me what I was out on the first judgment—and take title to the land. That is the only agreement in any way that I had with Mr. Sloan."

The defendant further testified that on the 20th day of May, 1914, he became again the president of the bank, and that he offered the land to the directors if they would pay off his judgment and that they declined to do so; that in May, 1917, "a short time before the land was actually sold, they had a directors' meeting, and when the matter came up as to what efforts were being used in the collection of the Henry Cooper judgment, and it drifted off in regard to the land—wanted to know if he still owned it. He told them that he did; that there was a man then offering to buy it—and wanted to know—asked the directors if they wanted it or if they claimed any interest in it, and they said 'No.' That he sold the land May 5, 1917, for $5,200; that the money was paid and deposited to the defendant's credit on the books of the bank; that he received the rents on the land in the sum of $350, for the years 1915, 1916, and 1917, and paid the taxes on the same in the sum of $119. That when he bought the land at the sale he took credit for part of the purchase money on the bank's judgment."

While there is evidence to the effect that the defendant on several occasions, when his attention was called to the matter by some of the directors, stated to them that the bank could take title to the land by paying the amount of his judgment, there is no evidence that shows or tends to show that the defendant at any time disclosed to them, or to any other official of the bank, the fact that he was about to sell the land for enough to satisfy both judgments—his own and the bank's, of which institution he was at the time, or shortly thereafter, the official head. It appears very clearly from an examination of the record that the directors of the bank relied entirely for their information concerning the bank's affairs on the defendant, and that the directors of the bank relied entirely for their

information concerning the bank's affairs on the defendant, and that the directors were never apprised of all the facts with reference to the resale of the land in question or of the amount which the defendant received in the sale of it, until long after the defendant sold it.

The question of whether the defendant promised and agreed with the president of the bank, Sloan, to bid in this land and take title to himself, and afterward sell it, and divide the proceeds in certain proportions between the defendant, as owner of Williams' judgment, and the bank on its judgment, was a question of fact, duly submitted to the jury, and their general verdict involved a finding of the truth of Sloan's version of the agreement had with the defendant. But in view of the surrounding facts and circumstances in this case, the confidential relationship existing between the parties, it was unquestionably the defendant's duty, in the absence of any promise upon his part, to protect the corporation, of which he was the official head at the time he made the second mortgage on the Cooper land, and was the bank's president at or about the time he sold the land.

In addition to the fiduciary relation referred to in this opinion, the record discloses that the defendant took credit upon the bank's judgment for balance of the purchase price, bid by him, at the foreclosure sale, and he took title to the whole tract in his own name, and it is our opinion that the defendant held title to the land in trust for the plaintiff bank, and he became liable to the bank for the balance received by him from the sale of the land after satisfying the Williams judgment, not only as a fiduciary, but also as an actual trustee.

It is clear to us from the disclosure of the record that when the defendant told some of the directors that they could take the land and pay his judgment, the defendant was aware, and the directors to whom he made his offer were unaware, that the defendant at that very time was about to sell the land in question for a sum sufficient to satisfy both judgments.

"If a person standing in a special relation of trust and confidence to another has information concerning property, and contracts with the other, and does not disclose his exclusive knowledge, the contract may be voided, or he may be held as a constructive trustee. * * *"   Perry on Trusts and Trustees, vol. 1 (6th Ed.) 178.

The duty devolving upon the official head of a business corporation to place the in-terests of the stockholders and creditors of such corporation above his own personal interests is too well settled to require the citation of authorities. The rule to be extracted from all the cases is that such an official is bound to exercise his official powers for the benefit of the corporation in the utmost good faith, and that in no case can he be permitted to use his official position to his own private gain and advantage.   Thompson on Corporations (2nd Ed.) vol. 2, sec. 1487.

It is perhaps for the purposes of this case sufficiently accurate to say that a careful reading of the evidence disclosed in the record leads to the conclusion that the defendant, so far as this particular transaction was concerned, failed to perform the duty he owed to the institution, whose financial affairs he was charged by the law to protect.

Counsel for defendant say in their brief:

"In the first place, the bank knew that Rose (defendant) had title to this land. It knew that it held the title to the judgment against Cooper. What else was there to disclose?"

We cannot ignore the unimpeached testimony of the directors of the bank, including that of the witness Nash, who became the president of the bank after the last retirement of the defendant from that position, all of which is to the effect that they were unable to discover the essential facts of the transaction from the defendant, but derived their information of the situation later from other sources. Such evidence tends to show that the defendant concealed rather than disclosed the facts relative to the entire transaction.

It is plain to be seen that the defendant's board of directors were clearly misled by his explanation concerning this transaction.

The second proposition discussed in defendant's brief is contained in the third assignment of error, which is the refusal of the court to instruct the jury, as requested by the defendant, as follows:

"You are instructed that there is no evidence in this case showing or tending to show any authority in Sam Rose to bind Jane P. Williams, to person who held the first mortgage on the land, by any agreement by which the land should be held by her and the bank as joint owners and you will disregard any evidence that may have been introduced as to statements and promises made by Rose prior to the time the Williams judgment was assigned to him, to the effect that the land should be purchased and

held in trust for the owners of the two judgments."

It appears that the defendant and Sloan, then president of the plaintiff bank, entered into the agreement to the effect that the defendant should bid in the lands upon which the Williams mortgage was a first lien, and the bank's mortgage was a second lien; take title to the same and sell it and divide the proceeds in certain proportions between the two judgment creditors, both before and after the defendant purchased the Williams judgment.

Defendant's answer admits that he was the agent of Jane P. Williams, the owner of the first mortgage, for the purpose of assisting her in collecting her debt, and it must be assumed that the bank officials, who relied upon the agreement referred to, were led to believe that the defendant had the authority to act for his principal.

However that may be, the defendant became the sole owner of the Williams judgment on the 26th day of December, 1913, and there is evidence in the record of a very positive character that the defendant repeated his promises as to the division of the proceeds of the sale after his ownership of the judgment.

The second question raised by counsel for defendant under this assignment of error is that the jury should have been instructed that the plaintiff must prove its case by clear, definite, and convincing testimony.

Counsel for defendant say in their brief:

"In this connection we will discuss the refused instruction set forth in the 4th assignment of error as well as the instruction given set forth in the 5th assignment of error, and instruction No. 5."

The language contended for by counsel for defendant was used by the court in the first instruction given, which instruction told the jury in effect that the ultimate facts must be found by evidence clear, definite, and convincing, and we observe nothing in any other instruction given by the court inconsistent or repugnant to instruction No. 1. That the instructions must be taken as a whole is a well established rule in this jurisdiction. Chickasaw Compress Co. v. Bow, 47 Okla. 576, 149 Pac. 1166.

It is not error for the court to refuse a requested charge, when the same proposition is covered by the instructions given and which, taken as a whole, fairly submit to the jury the law applicable to the case. Holmes v. Halstid, 76 Okla. 31, 183 Pac 969.

The case of First National Bank of Mounds v. Cox, 83 Okla. 1, 200 Pac. 238, is cited by defendant's counsel in their brief An examination of that case shows that instruction No. 4, attempting to define "menace" under our statutes, was not clear, but was confusing, and that instruction No. 5 was entirely without the issues and that the two together in all probability did confuse the jury.

In the case of Kansas City, M. & O. Ry. Co. v. Roe, 50 Okla. 105, 150 Pac. 1035, an examination of that case discloses the court in one instruction gave two different measures of damages.

In Barker v. Creek Coal & Mining Co., 80 Okla. 86, 194 Pac. 195, cited by counsel for defendant, the proof is partly based upon circumstantial evidence. The court instructed the jury that they could not enter into the field of conjecture or speculation, but failed to instruct that facts could be shown by circumstantial evidence; the court held the instruction misleading.

In St. Louis & S. F. Ry. Co. v. Dobyns, 57 Okla. 643, 157 Pac. 735, the court instructed the jury upon an issue not raised by the pleadings of the evidence.

We do not think that these cases support the defendant's contention.

When substantial justice has been done by the verdict and judgment, and no prejudicial errors appearing in the instructions, the judgment will be affirmed. Ponca City Ice Co. v. Robertson, 67 Okla. 86, 169 Pac. 1111.

Counsel for defendant say in their brief that the words, "clear, definite and convincing", should have been expressly emphasized by the court to the jury. The court in instruction No. 1 said, "You are instructed that if you find by clear, definite, and convincing evidence that the agreement as alleged was entered into between the plaintiff and the defendant. * * *"

We think this was a sufficient compliance with the requirements of the law in this character of case, and that the instruction offered by the defendant was substantially covered by the instruction already given by the court, and that the effect of instruction No. 1 was not destroyed by instruction No. 2, in which the court said:

"If in this case you do not believe that plaintiff has shown that there was any understanding between the plaintiff, through its managing officer and agent, C. W. Sloan, with the defendant," etc.

It is further contended by counsel for defendant that instruction No. 1 submitted an issue to the jury that was not made by the pleadings, and which was not within the theory of the case as shown by plaintiff's petition and statement of counsel. The argument is that there was no prayer for an accounting; that plaintiff sued for a definite amount; that there was no issue joined as to attorney's fees, expenses, rents, taxes, or anything of that nature when the court submitted to the jury the matter of an accounting: and finally that the instruction requiring an accounting and limiting the recovery to the amount of the Cooper judgment should not have been given.

It is sufficient to say that it was alleged in the petition that the defendant had failed to account, and that he owed the plaintiff a certain balance, and the prayer is for this balance and all other relief.

The prayer is no part of the petition, and the plaintiff under the prayer was entitled to all the relief the evidence warranted. Fraly v. Wilkerson, 79 Okla. 21, 191 Pac. 156.

In their argument under this assignment of error counsel for defendant take occasion to say:

"The theory of the defendant was that the the bank had the right within a reasonable time to pay off the Williams judgment, which the defendant owned, and take the land, but that not having done so, it lost that right and defendant had the right to sell the land."

The defendant had the right to sell the land, but not the right, as we view this case, to retain all of the proceeds of the sale, when, as the admitted facts disclose, the sum which the plaintiff received for the land was sufficient to satisfy his judgment and leave a substantial balance which should have been paid to the plaintiff bank on its judgment.

It must be borne in mind that the defendant had for many years been the official head of the plaintiff bank; that as the agent of Williams he made the first loan to Cooper, taking a first mortgage on the land in question, and later as president of the bank made the second loan, taking as security a second mortgage upon the same land. His retirement as president of the bank in January, 1913, still left him in close touch with the bank's affairs and the advisor of his successor, who frequently sought the defendant's advice in the directors' room, where the defendant had his office.

The defendant bid off the land at the sheriff's sale for $3,200, taking credit for a portion of the bank's judgment, and after the lapse of some three years, at about the time that he again became president of the bank, he sold the land for $5,200, and the question arises, Why he did not then retain out of the proceeds of the sale the amount of his judgment and pay over the remainder to the bank, to apply on its judgment?

If he was willing before the sale to convey the land to the bank in consideration of the payment to him of his judgment, there appears to be no reason why after the sale, which resulted in his receiving $5,200, he was not willing to satisfy the bank's judgment, to the extent that the surplus over and above his own judgment would permit.

There can be but one answer to this question, and that is that he treated the transaction from a purely personal standpoint, unmindful of the fiduciary relationship that existed between himself and the bank; the defendant's official position being that of a trustee.

Counsel for defendant say in their second brief: "But when an officer of a bank resigns and sells his stock, and another officer is appointed to his place, there is no presumption that the old officer has any influence or control over the new manager."

We do not think the defendant's temporary relinquishment of the office of president of the bank and his subsequent resumption of that position operated, in the light of the facts and circumstances disclosed in this record, to relieve him from the performance of his duty to the stockholders and creditors of the bank of which he was the head at the inception of the transaction; particularly when the evidence is so conclusive of the fact that during the time of the defendant's absence from his office as managing head of the bank he continued to keep in touch with the bank's affairs, and to be the trusted confidant and advisor of his successor and of the directors.

The sixth assignment of error is directed to the giving of instruction No. 2, already referred to.

Three objections are made to this instruction: That it is not clear; that it in effect permits the jury to base their verdict on a preponderance of the evidence. These objections have been considered. The third objection is that the jury was instructed "that if it found no agreement was made as claimed by plaintiff, and that if it found defendant paid $3,200 for the land, and that

a part of that amount was in excess of the Jane P. Williams mortgage, then owned by the defendant. the verdict must be for defendant, because recovery on the excess was barred by the statute of limitations."

It is contended that this instruction was not warranted by the pleadings or the evidence in the case. We cannot agree with that contention. The instruction complained of was favorable to the defendant. The defendant had pleaded the statute of limitations, and we think it was within the issues and the defendant's theory of the case. We think the instruction complained of was based upon the pleadings and the evidence and that the cases cited do not support the defendant's contention.

The last proposition discussed in defendant's brief is that the court erred in overruling the demurrer in plaintiff's petition.

Under this assignment it is contended that the contract mentioned in the petition was an oral contract; and that such contract is not valid unless in writing.

It was not an interest in the land that the plaintiff was seeking, but its proportionate share of the fund growing out of the sale of the land, which had been sold by the defendant in conformity to the agreement, so that the fund could be distributed equitably between the parties. The agreement had been completely performed as to the sale of the land, and the part remaining to be performed was merely the payment of money, the promise to do which is not required to be in writing. 29 Am. & Eng. Ency. of Law, 852.

Our own court, in Logan v. Brown, 20 Okla. 334, 95 Pac. 441, said:

"The provision of the statute of frauds or of uses and trusts have no application where the agreement has been completely performed as to the part thereof which comes within the statute, and the part remaining to be performed is merely the payment of money, the promise to do which is not required to be in writing."

To the same effect are the cases of Purcell v. Corder, 33 Okla. 68, 124 Pac. 457, and Shippey v. Bearman, 57 Okla. 609, 157 Pac. 304.

The defendant earnestly insists that there was no fiduciary relation between defendant and plaintiff, and that no trust relation existed that makes the plaintiff liable. We are constrained to think otherwise. We think that a confidential relation existed, and that this suit was based upon a breach of trust, and that the fact that the plaintiff seeks a recovery of money does not change its character, in view of the aver-

ments of the petition and the facts and circumstances disclosed in the evidence.

"The plaintiff may unite several causes of action in the same petition, whether they be such as have heretofore been denominated legal or equitable, or both, where they all arise out of any one of the following classes: * * * Claims against a trustee, by virtue of a contract, or by operation of law." Subdivision 7, sec. 266, Comp. Stat. 1921.

Upon a review of the entire record, we think the judgment of the trial court should be affirmed.

By the Court: It is so ordered.